THE PEOPLE OF THE STATE OF NEW YORK ex rel. CORNELL UNI-VERSITY, Relator; CHI OF PSI UPSILON ASSOCIATION, INC., Inter-vener, Relator, against HENRY C. THORNE et al., as Assessors of the City of Ithaca, Respondents.•

(Proceeding No. 1.)

THE PEOPLE OF THE STATE OF NEW YORK ex rel. CORNELL UNI-VERSITY, Relator; EPSILON ASSOCIATION, INC., Intervener, Relator, against HENRY C. THORNE et al., as Assessors of the City of Ithaca, Respondents.

(Proceeding No. 2.)

Supreme Court, Trial and Special Term, Tompkins County, January 15, 1945.•

---

* Opinion prepared by PERSONIUS, J., prior to his death on December 12, 1944, and thereafter released on January 15, 1945, by DEYO, J., pursuant to stipulation of the parties.

*L. Nelson Simmons* and *Allan H. Treman* for relator.

*Nathan Turk* and *John M. Parker* for interveners, relators.

*Truman K. Powers* for respondents.

PERSONIUS, J. These two proceedings seek to review the assessment by the assessors of the City of Ithaca of two buildings (exclusive of the land), occupied respectively by Chi of Psi Upsilon Association, Inc., and Epsilon Association, Inc., interveners. The relator and interveners contend that not only the land on which the buildings are erected but the buildings, themselves, belong to Cornell University, a corporation organized for educational purposes, and are, therefore, exempt from taxation under subdivision 6 of section 4 of the Tax Law.

The respondents contend that these buildings, under the terms of the contract pursuant to which they were built, and because of their use, are not exempt.

The principal, though perhaps not absolutely controlling issue, is whether the buildings in question were " used exclusively " for carrying on the relator's educational purposes. Were these buildings " dormitories " in the ordinary sense, or " fraternity houses "? On the question of ownership, the relator holds the technical and record title. Its title is not subject to reversion but is subject to certain substantial limitations.

We have neither been referred to nor found any authorities which are controlling. However, there are certain principles of law applicable on all issues of exemption from taxation and some other authorities which have some similarity to the issues here.

Section 4 (all references are to the Tax Law) provides in part: " The following property shall be exempt from taxation: * * *. The real property of a corporation * * * organized exclusively for * * * educational * * * purposes, and used exclusively for carrying out * * * such purposes.

\* \* \* The real property of any such corporation not so used exclusively for carrying out thereupon one or more of such purposes but leased or otherwise used for other purposes, shall not be exempt \* \* \*."

The relator is organized exclusively for educational purposes. Even so, there are two conditions to the exemption of its property: (1) that the relator *own* the property; and (2) that it be *used* exclusively for carrying out its purposes. While, as we will point out, there are certain limitations or conditions on the relator's absolute ownership, we consider mainly the question whether the property is exclusively *used* for the relator's educational purposes. Such exclusive use, as well as exclusive ownership, is necessary to warrant an exemption. (*People ex rel. Masonic Hall Association* v. *White,* 126 Misc. 661, 666, affd. 218 App. Div. 38, affd. 244 N. Y. 564; *People ex rel. Perry Lodge* v. *Clark,* 125 Misc. 618; *People ex rel. Silver Lake Mutual Assn.* v. *Clark,* 125 Misc. 622; *People ex rel. Perry Temple Association* v. *Clark,* 125 Misc. 625; *People ex rel. D. K. E. Society* v. *Lawler,* 74 App. Div. 553, 556, affd. 179 N. Y. 535; *Matter of Bd. of Education, Jamestown,* v. *Baker,* 241 App. Div. 574, affd. 266 N. Y. 636.) While the last case involved the question of ownership, there seems to have been no question about the exclusive use. It indicates that both must concur to warrant exemptions.

Another principle has application here. " Tax exemptions, however, are limitations of sovereignty and are strictly construed. \* \* \* If ambiguity or uncertainty occurs, all doubts must be resolved against the exemption." (*People* v. *Brooklyn Garden Apartments,* 283 N. Y. 373, 380.)

" Moreover, the general policy of the law in cases of this character is to require all to bear in just proportion the burdens of government and, therefore, to construe strictly statutes exempting property from taxation by denying exemptions which depend on doubtful implication." (*Matter of Kennedy,* 240 App. Div. 20, 23, affd. 264 N. Y. 691.) This principle runs throughout the authorities. (*City of Rochester* v. *U. F. S. Dist. No. 4 of Livonia,* 255 App. Div. 96, 98, affd. 280 N. Y. 531; *Matter of Schwartzman,* 262 App. Div. 635, 636, affd. 288 N. Y. 568.)

This rule is applied to cases involving fraternity houses. (*People ex rel. D. K. E. Society* v. *Lawlor,* 74 App. Div. 553, 557, affd. 179 N. Y. 535, *supra; Knox College* v. *Board of Review,* 308 Ill. 160; *The People* v. *Phi Kappa Sigma,* 326 Ill. 573; *Kappa Gamma Rho* v. *Marion County,* 130 Ore. 165; *Orono* v. *Sigma Alpha Epsilon Society,* 105 Me. 214.) These cases may not

involve the question of ownership but only the question of exclusive use. That question is here.

Of course the presumption in favor of assessments cannot control when there is substantial evidence to the contrary (*People ex rel. Wallington Apartments* v. *Miller*, 288 N. Y. 31), and the Tax Law should be liberally construed and the right of review not defeated by technicalities. (*People ex rel. N. Y. City Omnibus Corp.* v. *Miller*, 282 N. Y. 5, 9.) There, as in *People ex rel. Bingham Operating Corp.* v. *Eyrich* (179 Misc. 197, affd. 265 App. Div. 562) questions of *practice* in reviewing assessments, not the merits of the assessment, were being considered.

Dormitories established by a college for the use of *all* students may well be and have been exempted in this and other States. (*Matter of Syracuse University*, 214 App. Div. 375; *People ex rel. Trustees* v. *Mezger*, 98 App. Div. 237, affd. 181 N. Y. 511; *St. Barbara's R. C. Church* v. *City of New York*, 243 App. Div. 371; *The People* v. *North Central College*, 336 Ill. 263; *Harvard College* v. *Cambridge*, 175 Mass. 145; *Yale University* v. *New Haven*, 71 Conn. 316.) In these cases, the dormitories were devoted to all students. In the present case the use of the buildings in question as dormitories is limited to students who are members of the respective fraternities and designated as eligible to live therein. *Yale University* v. *New Haven* (*supra*) cited by relator and interveners, is the leading case exempting dormitories. There the authorities assessed buildings used generally for dormitories and dining halls, located on university lands. The building in question was used as a general dormitory for all students. The court recognized the rule of strict construction. At page 329 the court said: " This " statute " does not exempt any individuals from the burden of taxation that is common to all; it does not grant to one, particular privileges denied to all others; it declares that lands and buildings sequestered to certain public uses * * * are not taxable property." Again at page 334: " * * * the committee finds that the corporation administers a college within the true intent and meaning of its charter, ' wherein all such persons of good moral character as desire to avail themselves of its advantages, irrespective of nationality, domicile, color, creed or religious belief [and we might say fraternity membership], are * * * instructed in the arts and sciences.' There are no special facts found necessarily inconsistent with this conclusion. * * * All the dormitories occupied by students * * * are non-

taxable property * * *." Speaking of a house occupied by a professor, sold to him but not paid for, the court said at page 338: "This presents a case of property substantially owned and enjoyed by a private person, while the title remains in the College; the lot and house should be added * * *" to the taxable list. This case recognized the necessity of the property being used for all students, irrespective of class and not limited to a private or special group.

Fraternity houses, call them dormitories if you wish, located *off* the college grounds, campus, are not exempt from taxation. (*People ex rel. D. K. E. Society* v. *Lawler,* 74 App. Div. 553, affd. 179 N. Y. 535, *supra; Knox College* v. *Board of Review,* 308 Ill. 160, *supra; The People* v. *Phi Kappa Sigma,* 326 Ill. 573, *supra; Orono* v. *Sigma Alpha Epsilon Society,* 105 Me. 214; *Kappa Gamma Rho* v. *Marion County,* 130 Ore. 165, *supra; Beta Xi Chapter* v. *City of N. O. et al.,* 18 La. App. 130.) The relator argues that these cases are not applicable because the real property was not owned by the college or university. However, an examination of these cases will show that the court concerned itself, not with the *title* to the property, but with the *use* to which it was put. In some instances the fraternity was incorporated for purposes, among others, which entitled it to exemption though not connected with the university. In *People ex rel. D. K. E. Society* v. *Lawler (supra,* p. 554) the relator's charter declared its purpose to be "literary, and for the promotion of the fine arts." The court said (p. 556): "*However, the purposes for which a corporation is organized [though educational] and those for which its property is used are for obvious reasons quite distinct and independent matters. The two requirements must concur * * *."* (Emphasis and bracketed words ours.) Although the court admitted that the fraternity house was used to some extent, at least, for carrying out "one or more purposes specified in the statute, to wit, educational, scientific and literary purposes," it held that these did not entitle it to exemption unless it was "used exclusively" for carrying out such purposes. It went on to point out that its primary purpose was to afford the members of the fraternity an abiding place for social intercourse, the entertainment of their friends, dancing and similar amusements, saying (p. 558): "In short, it is to all intents and purposes a club house, a place for rest, recreation and fraternal intercourse, rather than for the purposes for which it is claimed to have been organized, which purposes are plainly secondary and incidental * * *." As we will point

out, the uses of the buildings in question are quite similar. They are used as chapter houses of any fraternity usually are. Without discussing these cases individually, we believe it will be found that in each the question of exemption from taxation turned not alone on the title to the property but on the use to which it was put. In *Knox College* v. *Board of Review* (*supra*, p. 166) the court said: " The fraternity houses here in question, however, are not shown by the evidence to be buildings created for the indiscriminate use of all the students, but are, as we understand the record, open only to the members of the respective fraternities, not by virtue of their college attendance but only upon election to membership in such fraternities under rules established by the societies themselves. Because some advantage might accrue to the college by the fraternities furnishing accommodations for students, thus lessening the need for college dormitories, and because the contractual relations between the fraternities and the college made these fraternity buildings mutually advantageous to the college and students, that does not change the fact that they are fraternity houses not unconditionally open to all students and not ostensibly or actually used exclusively for educational purposes. * * * These fraternity buildings were properly taxed."

In *The People* v. *Phi Kappa Sigma* (326 Ill. 573, 577, *supra*) the court said: " Property used exclusively ' for the benefit of an indefinite number of persons * * * ' has been held exempt * * *. To constitute a public charity the benefit must *not* be conferred upon certain and defined individuals, but must be conferred on indefinite persons composing the public or some part of the public * * *." (Italics supplied.) The fraternity house was held not exempt. In *Orono* v. *Sigma Alpha Epsilon Society* (105 Me. 214, 218, *supra*) the chapter house was erected on the campus but by the fraternity. It held that the fact that the land was owned by the fraternity made " no legal difference in the result." In other words, the decision was based upon the use and not the ownership.

Were the buildings in question intended for actual use for educational purposes? Are they so used?

We find the facts as herein stated. Formerly, some Greek-letter fraternity houses were constructed on lands owned by the university, the campus. These houses were not exempt. The arrangement under which they were constructed is not proven, but it appears that the university gave the right to use the land at a nominal charge, reserving the right to dispossess any fraternity at any time upon paying the fair market value of the

house. Under such an arrangement, the interveners here each erected a fraternity house on the campus. About 1929 the university exercised its right of cancelation and required them to vacate the land. The university paid each fraternity the appraised value of its house, both aggregating over $250,000.

The university had wisely, we think, adopted a plan under which no fraternities were thereafter to be permitted to erect houses on the campus. The plan further provided that men's dormitories should be restricted to a certain area of the campus. This plan did not contemplate small housing units but " dormitories."

These fraternities endeavored unsuccessfully to find suitable locations off the campus.

Thereupon they opened negotiations for a modification of the plan so as to permit the erection, on the campus, of small housing units, one for each fraternity, at the expense of the fraternity. By gift the unit was to become the property of the university, *but to be used only by undergraduate student members of the fraternity.*

Pending the negotiations, the university's plan was modified by it. The modification referred primarily to fraternity housing. Originally, it contemplated large dormitories for use by any and all students. For the first time the plan provided for a " fraternity group " of units housing small groups of from twenty to thirty students " without violating the idea of social autonomy," and with much larger cubic foot space per occupant than the dormitories. Clearly, the intent was to provide for private houses or units to be occupied only by undergraduate members of some fraternity. They were not to be available to students generally as a dormitory.

The plan having been so modified, similar contracts were entered into between the university and each intervener. Pursuant to the contracts, the buildings were constructed, occupied and are still used. Each fraternity gave the university $25,000 for the construction of roads and utilities necessary to the buildings. Each fraternity gave the university the moneys required for construction, $145,256.96 and $129,273.21, respectively. (They are assessed for $100,000 and $90,000 respectively.) One unit accommodates thirty students, the other twenty. Each unit contains not only sleeping and dining rooms but one or two living rooms, card room, library, large hallways, complete suite for guests, recreation rooms, squash court, and a chapter or private room for fraternity meetings and initiations. More emphasis is placed upon the social rooms than in

an ordinary dormitory. The plans were laid and the buildings constructed by the university's contractor and architect. The university may terminate either agreement upon one year's notice and paying the then fair value of the buildings. In the meantime, the buildings are designated '' Psi Upsilon House '' or '' Hall '' and the '' Sigma Phi House '' or '' Hall.'' The rooms are occupied by undergraduate members of the respective fraternities who, however, are designated from time to time by the members of the fraternity chapter occupying them. The chapter is, of course, a self-perpetuating group. No other student can occupy the building. True, the university leases each room to the occupant at $50 per year but the lessee must be designated by the chapter. Unless a sufficient number to fill the rooms is designated, the remaining remain vacant so long as the fraternity pays a minimum of $1,250 or $800 respectively per year.

The university insures the buildings but the fraternities pay the premiums. In case of fire the university, on request, is to expend the amount received as insurance toward the replacement of the property. If the amount received proved insufficient for such replacement, the university agreed to make the additional expenditure *only* if it was contributed by the fraternity.

The university furnishes the light, heat and water but the fraternities pay therefor the regular rate. The university furnishes sewage connection but connected with the city system.

The intent to create a social fraternity neighborhood is apparent. Paragraph Twelve of the contract provides that in making a similar arrangement with another '' residential unit '' in the area, '' consultations shall be had '' with the interveners in an endeavor to provide for housing groups creating a '' neighborhood mutually congenial.'' The express purpose of the plan was for economic advantages '' without violating the idea of social autonomy.''

These buildings differ from the ordinary dormitory in many respects. We have pointed out the increased cubic foot area per occupant. While in all dormitories provision is made for social and recreational activities, they are furnished to a much greater extent in these buildings. Dormitories are equipped and furnished by the university. These buildings were furnished by the respective fraternities. In ordinary dormitories, the utility service is included in the rent. Here it is billed to the chapters. The university's representative assigns

dormitory rooms. In these buildings each chapter makes the assignment. The relator urges that these buildings are used for educational purposes because outside groups use the general rooms for various meetings. The same is true of other fraternity buildings, though perhaps more so in the interveners' buildings because they are more modern and possibly more grandiose.

The only substantial difference between these fraternity buildings and other fraternity houses on and off the campus is that the latter are owned by the fraternities, while the title to the former is in the university. But, although we do not place our decision on this fact, the university's title to these buildings is limited at least so far as beneficial use of the buildings is concerned. It may not deprive the interveners of the exclusive use without paying for the buildings. It may not place any student therein except upon the request of the respective chapters. It can only rent to their designees. It cannot raze or even remodel the buildings. It cannot sell or deliver them. Relator says the interveners have no liens on the buildings. Technically, they have none. Practically, they can interfere with their free use.

True, in dormitories the university authorities may allocate portions thereof to seniors, juniors, etc., to engineers, architects, law students, etc. Such allocations are made on scholastic basis and are made by the university. The allocation of rooms in these buildings is made on the basis of membership in the fraternity and by the fraternity on no scholastic basis. The former allocation is for educational purposes; the latter is not exclusively for educational purposes. Can it be denied that the latter allocation is not exclusively for educational purposes but is made upon a social basis?

We have seen that in case of doubt, an exemption statute is strictly construed. Was there a doubt in the minds of these parties when they provided by the contract that the occupants should pay an amount equal to any tax lawfully levied or agreed to by the university?

The relator and interveners insist that these buildings are college dormitories, which are exempt. (*Matter of Syracuse University,* 214 App. Div. 375, *supra; People ex rel. Trustees* v. *Mezger,* 98 App. Div. 237, affd. 181 N. Y. 511, *supra; St. Barbara's R. C. Church* v. *City of New York,* 243 App. Div. 371, *supra; The People* v. *North Central College,* 336 Ill. 263; *Harvard College* v. *Cambridge,* 175 Mass. 145; *Yale University* v. *New Haven,* 71 Conn. 316.)

We hold that these buildings are, and are used as private fraternity houses, the same as fraternity houses owned by the respective fraternities, either on or off the campus, which are not exempt. (*People ex rel. D. K. E. Society* v. *Lawler,* 74 App. Div. 553, affd. 179 N. Y. 535, *supra; Knox College* v. *Board of Review,* 308 Ill. 160, *supra; The People* v. *Phi Kappa Sigma,* 326 Ill. 573, *supra; Orono* v. *Sigma Alpha Epsilon Society,* 105 Me. 214, *supra; Kappa Gamma Rho* v. *Marion County,* 130 Ore. 165, *supra; Beta Xi Chapter* v. *City of N. O. et al.,* 18 La. App. 130, *supra.*)

Controlling is the fact that the buildings in question are not used exclusively for educational purposes, any more than a fraternity house off the campus.

Submit order in accordance herewith.